1

2

3

4

5

6

7

8 **IN THE UNITED STATES DISTRICT COURT**

9 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11 CARL D. MITCHELL,                        No. CIV S-09-0269-MCE-CMK-P

12             Petitioner,

13     vs.                                 FINDINGS AND RECOMMENDATIONS

14 A. HEDGEPETH,

15             Respondent.

16 _____/

17             Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of

18 habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the court are petitioner's petition

19 for a writ of habeas corpus (Doc. 1), respondent's answer (Doc. 17), and petitioner's reply (Doc.

20 20).

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

1

# I. BACKGROUND

A.   **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

<u>Robbery of Goeman's Lounge</u>

On October 10, 2004, at about 11:00 p.m., bartender Jesus Valadez and a customer named David Mooney were the only two people in Goeman's Lounge on Franklin Boulevard.  An African-American man and woman entered the bar.  The man ordered a beer and Valadez saw him reach into his back pocket.  When Valadez next turned around, he saw the man pointing a silver handgun at him.

Mooney only glanced at the couple when they came in and then turned his attention back to the television.  When Mooney heard the man say something about moving to the end of the bar, he glanced back and saw the man pointing a chrome-plated revolver at him.  The man told Mooney not to look at him, to put his head down and move to the end of the bar.  Mooney closed his eyes and moved as instructed.  The man told Mooney to lie on the floor, handed Valadez a roll of duct tape and told Valadez to tie Mooney up.

When Mooney's hands and feet were taped together, the man took Valadez back to the safe.  The man told Valadez if he did not open the safe, he would blow his brains out.  Valadez felt the gun at his head.  Valadez opened the safe and the man took the money that was inside.  Then they returned to the front of the bar.  The man ordered Valadez to open the cash register.  Valadez did and the man took all the money.  The man told Valadez to lie down on the floor and directed his female companion to tie Valadez up, which she did.  The man told Valadez and Mooney not to move for five minutes or he would kill them.  The couple left the bar.

After a couple of minutes, Valadez and Mooney freed themselves from the duct tape.  Valadez called the police and then his boss.

The description Valadez gave of the male robber to the 911 operator and the responding officer differed slightly from his description of him at trial, both of which were different to defendant's actual age, height and weight.  Two months after the robbery, Valadez picked defendant out of the physical lineup conducted at the jail.  It took him about a minute to choose defendant.  Valadez said defendant's face looked very familiar, but he could not be sure.  At trial Valadez identified defendant as the male robber, testifying again he looked familiar, but he

---

[1]     Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  <u>See id.</u>  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

could not be absolutely sure.

Mooney did not attend the physical lineup. He was shown photographs of the men from the lineup in February 2005. Mooney testified he told the officer he thought it might be either photograph No. 3 or No. 4 (defendant). The officer testified Mooney actually eliminated photograph No. 3 and No. 4. At trial Mooney identified defendant in court as the male robber.

Robbery of Trino's Bar

On October 18, 2004, at about 1:00 a.m., bartender Tracy Biagi and customer Gary Slauson were the only two people in Trino's Bar located on Fulton Avenue. An African-American man and woman entered the bar. Biagi served each of them a beer and then couple visited the patio area in the back. When they came back, they laughed and talked with Biagi until closing time. Biagi told the couple they would have to finish their drinks and leave. Biagi started to close out the cash registers and asked Slauson, who had been playing darts, to let them out the door.

As the man stepped outside the door, he turned and struck a chrome-colored gun into Slauson's belly. The man grabbed Slauson's arm, turned him around, and directed him back inside the bar. The man pointed the gun at Biagi, who had turned around to see Slauson and the man walking back. Biagi put her hands up and the man told Biagi to walk over to him. He told Biagi and Slauson to lie down. The man then directed his female companion to tape Slauson up. The woman taped Slauson's hands and feet with sliver duct tape.

The man told Biagi to get up. He wanted to go to the back where the safe and surveillance tape were located. Biagi accompanied the man to the back of the bar and gave the man the tape from the VCR, but told him her boss was the only person with access to the safe. Biagi opened the lockbox for which she had a key and gave the man $50 of rolled quarters from inside. When she eventually convinced him she could not get into the safe, they walked back to the registers behind the bar. Biagi opened the two registers. The man ordered her to lay down by Slauson with her arms behind her back. Biagi laid down. Her arms and legs were duct taped. She heard the man by the register, the sound of coin trays being moved, the tip bucket being moved and crunching money. The man told Biagi and Slauson not to move for five minutes or they would be sorry. Biagi heard the bar door open and close.

Biagi and Slauson freed themselves from the duct tape. Biagi called the police and then her boss. Later, Biagi realized that an ID was missing from the cash register. At trial she identified a driver's license for Janis LaBella, found in defendant's car, as the missing ID. LaBella, a customer of Trino's Bar, also identified the ID as her license.

On December 8, 2004, Biagi picked defendant out of the physical lineup at the jail. She identified defendant before the curtains in the viewing room were even fully opened. Biagi also identified defendant at trial as the man who robbed the bar. She said defendant had the same lump on his head as the male robber. She also recognized his eyes and nose. There was no doubt in her mind. Biagi denied seeing news coverage photos of defendant after he was arrested in connection with a

1   subsequent robbery.

2        Slauson also identified defendant at the physical lineup conducted on December 8. Slauson recognized defendant as soon as he saw him. He was sure about his identification. At trial Slauson identified defendant as the male robber. There was no doubt in his mind.

3

4        Robbery of Oak's Lounge

5        On October 20, 2004, at about 11:15 a.m., bartender Debbie O'Dell was inside the Oak's Lounge on Auburn Boulevard getting ready to open. The only other person in the bar was the owner Roy Tillis. Around 11:20 a.m., an African-American man and woman entered the bar. According to O'Dell, the man was wearing a dark navy blue jacket and light colored jeans. He had a cap on. The woman was wearing a jacket and what looked like a wig of long wavy hair. They asked O'Dell if there was a place they could eat chicken and O'Dell provided a phonebook. The woman used the restroom and then the man went down the hall to use the restroom.

6

7

8

9

10        Tillis was in his office preparing the daily tills. The safe was open and there was about $5,800 in cash in the tills, the safe, and laying out in the office. Tillis staples his $10 bills into packs of $100. Tillis looked up to see a man come into the office holding a dark, "bluing" colored revolver. The man told Tillis it was a holdup. He made Tillis get up from the desk and hold a bag while the man took out all the money from the safe into the bag. The man grabbed the plastic tray inside the safe and unsuccessfully tried to pull it out. When he had all the money, he ordered Tillis into the bar area.

11

12

13

14

15        O'Dell saw Tillis come out of his office with the man behind them. The man was holding a silver revolver and a bag. The man pointed the gun at O'Dell's face and told her and Tillis to get down on the floor. The man asked his female companion to tie them up with duct tape. The man then directed O'Dell to get up. He first took her back to the office and then made her go into the restroom. He told her not to come out or he would kill her.

16

17

18        Tillis saw the couple leave the bar. He immediately broke free of his duct tape and went to the restroom to check on O'Dell. Tillis told her to call the sheriffs. He then ran to the front door, got in his truck and drove around the corner of the bar, where he saw the couple starting to get into their Ford Explorer. Tillis saw the man open the driver's door and get into the car with the money bag in his hand. There were no other cars in the area. Tillis chased the Explorer as it drove through residential streets and onto westbound Interstate 80. When Tillis's truck appeared to be running out of gas, Tillis accelerated and tapped the Explorer to make it stop. Both cars spun out. Tillis ended up on the inside center rail and the Explorer ended up on the right side of the freeway.

19

20

21

22

23

24        As Tillis tried to cross the freeway, Tillis observed the man and the woman get out of the Explorer. The man grabbed the money bag, spilling some of the money onto the driver's seat and ground. Once Tillis got to the Explorer, he picked up the money and threw it back inside the car. The man was going up the embankment from the freeway and the woman was trying to follow him. She did not have on her wig. It was left in the

25

26

Explorer.  The man's coat was gone.  He was wearing a white shirt.  Tillis saw the man swing the money bag over a fence at the top of the embankment, jump over the fence and then disappear.

Shannon Fannin was traveling on eastbound I-80 at the time.  He noticed smoke coming off the other side of the freeway and stopped to help.  He saw the driver of a Blazer-type vehicle get out of the car and take off running of the hill.  Fannin described the man as Black, in his late 20's to early 30's, wearing a blue sweater or sweatshirt with a stripe in it and blue jeans.  There was a grayish bag in the man's hand.  A second person came out of the car.  Fannin thought it was a woman.  She was wearing a black fluffy down jacket and carrying an oversized purse.  When the man got to the top of the hill, he grabbed the fence, looked back at the car and then climbed to the other side.  Fannin called 911 as he watched the man go up the hill.  Fannin never had a full view of the man's face, but identified defendant at trial as the man he saw going up the hill.  Fannin was fairly certain from the side profile of defendant's face.

Robert Black was sweeping the driveway of his home on Harris Avenue facing the I-80 freeway on October 20, 2004, at about 11:30 a.m.  He heard a crash on the freeway and went to see what was going on.  He saw a Black man dressed in a blue jogger suit coming over the hill.  A Black woman was following him up the hill.  She was dressed all in black.  She had a long fluffy coat and was carrying a big black purse.  The man had a brown paper bag in his hands.  Money was falling out of the bag.  Black asked the man if he needed help, but did not get a response.  A person at the bottom of the hill told Black the man had just robbed him.  Black got in his truck to follow the man and woman who were moving toward North Avenue.  When the couple split up, Black followed the man until he met a parking officer who told him the police had been notified.

Sacramento Police Officer Joseph Alioto detained defendant in the area of North Avenue and Clark.  Defendant was wearing blue jeans and a green jacket zipped up.  Under the jacket defendant had on a white T-shirt.  The green jacket had a dark blue interior.  Defendant was found to have money, including stapled $10 bills, in his shoes.

Tillis and Black were separately taken to view defendant in a field show-up.  Tillis was 80 percent positive defendant was the male robber when he saw him 30 to 60 feet away.  Then offices brought defendant up close to Tillis, Tillis saw defendant's face and sais, "Yes, that's him."  Black also identified defendant at the show-up as the man he had seen climb over the fence, but said defendant had changed clothes.  Both Tillis and Black were shown other possible suspects, but said they were not the man.  In December 2004, at the physical lineup, it took Tillis only a second to identify defendant.  O'Dell also quickly identified defendant at the physical lineup.  Both Tillis and O'Dell were certain of their identification.  At trial, O'Dell, Tillis, Fannin and Black all positively identified defendant as the robber.

O'Dell, Tillis, Fannin and Black did have difficulty specifically identifying the various items of clothing collected by the police from defendant, his Ford Explorer, and the area above the freeway.

Inside the Explorer, officers found $1,764 in cash, including $10 bills stapled together, a black coat with a handgun in the pocket, a wig, LaBella's ID (located between the driver's seat and the center console),

checks made out to the Oak's Lounge, a vehicle registration and a vehicle insurance document for the Explorer made out in the names of defendant and his wife, and other paperwork connecting the car to defendant.

Two latent fingerprints found on the plastic money tray from the Oak's Lounge safe matched defendant's known fingerprints.

<u>The Defense</u>

Defendant testified on his own behalf.  He claimed at the time of the Oak's Lounge robbery he was flagged down in the Auburn Boulevard area by three individuals who he thought were women.  They were standing by a car with its hood up.  They asked and offered to pay for a ride to South Sacramento.  Although defendant was headed home to West Sacramento, he agreed to give them a ride.  Two of them got into his Explorer and the person in the back directed him onto the highway. Suddenly defendant found himself being chased by a gold pickup truck. The person in defendant's backseat told defendant to "just get us out of here fast."  Defendant looked back and saw the person in his backseat had removed a wig, revealing he was a man, and he was putting money into his pocket.  The man promised to "kick [defendant] in" if defendant got them our of there.  The man had a gun.  On the freeway, the gold truck bumped the Explorer and spun them out.  As they were coming to a stop, the man in the backseat handed defendant a couple of bundles of money, jumped out and headed up the hill.  Not wanting to be "left holding the bag," defendant decided to get out and run up the hill too.  He took a different path from the other man.  Defendant did not see Black at the top of the hill.  When stopped by the police, defendant admitted he gave them untrue explanations of what he was doing in the area.  He put the money he was given in his shoe.

Defendant denied robbing the Oak's Lounge.  He claimed he had never been inside the bar in his life.  Defendant denied the prints on the inside of the safe were his.  Defendant denied robbing either Goeman's Lounge or Trino's Bar.

**B.    Procedural History**

Petitioner is serving consecutive life sentences following his conviction on three counts of armed robbery, six counts of false imprisonment, and enhancements for use of a firearm and prior robbery convictions.  Petitioner filed a direct appeal in the California Court of Appeal which affirmed the convictions.[2]  Petitioner filed a petition for review in the California Supreme Court which was denied.  Petitioner then filed two habeas corpus actions in the Sacramento County Superior Court, both of which were denied.  Thereafter, petitioner filed

---

[2]     The matter was remanded for resentencing on issues unrelated to the claims raised in this case.

1  habeas petitions in the California Court of Appeal and the California Supreme Court, both of

2  which were denied.

3

4  ## II.  STANDARDS OF REVIEW

5          Because this action was filed after April 26, 1996, the provisions of the

6  Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

7  applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

8  (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA

9  does not, however, apply in all circumstances.  When it is clear that a state court has not reached

10  the merits of a petitioner's claim, because it was not raised in state court or because the court

11  denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

12  habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.

13  2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach

14  petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208

15  (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

16  perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

17  evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

18  petition de novo where state court had issued a ruling on the merits of a related claim, but not the

19  claim alleged by petitioner).  When the state court does not reach the merits of a claim,

20  "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

21          Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

22  not available for any claim decided on the merits in state court proceedings unless the state

23  court's adjudication of the claim:

24                    (1) resulted in a decision that was contrary to, or involved an
                     unreasonable application of, clearly established Federal law, as determined
25                    by the Supreme Court of the United States; or

26  / / /

1                          (2) resulted in a decision that was based on an unreasonable

                         determination of the facts in light of the evidence presented in the State

2                          court proceeding.

3 Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is

4 "contrary to" or represents an "unreasonable application of" clearly established law.  Under both

5 standards, "clearly established law" means those holdings of the United States Supreme Court as

6 of the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. 70, 74 (2006)

7 (citing Williams, 529 U.S. at 412) .  "What matters are the holdings of the Supreme Court, not

8 the holdings of lower federal courts."  Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en

9 banc).  Supreme Court precedent is not clearly established law, and therefore federal habeas

10 relief is unavailable, unless it "squarely addresses" an issue.  See Moses v. Payne, 555 F.3d 742,

11 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)).

12 For federal law to be clearly established, the Supreme Court must provide a "categorical answer"

13 to the question before the state court.  See id.; see also Carey, 549 U.S. at 76-77 (holding that a

14 state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not

15 contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice

16 created by state conduct at trial because the Court had never applied the test to spectators'

17 conduct).  Circuit court precedent may not be used to fill open questions in the Supreme Court's

18 holdings.  See Carey, 549 U.S. at 74.

19         In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

20 majority of the Court), the United States Supreme Court explained these different standards.  A

21 state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

22 the Supreme Court on the same question of law, or if the state court decides the case differently

23 than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

24 court decision is also "contrary to" established law if it applies a rule which contradicts the

25 governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

26 that Supreme Court precedent requires a contrary outcome because the state court applied the

wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

determine first whether it resulted in constitutional error.  See Benn v. Lambert, 283 F.3d 1040,

1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

State court decisions are reviewed under the far more deferential "unreasonable

application of" standard where it identifies the correct legal rule from Supreme Court cases, but

unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.

510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested

that federal habeas relief may be available under this standard where the state court either

unreasonably extends a legal principle to a new context where it should not apply, or

unreasonably refuses to extend that principle to a new context where it should apply.  See

Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

decision is not an "unreasonable application of" controlling law simply because it is an erroneous

or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found

even where the federal habeas court concludes that the state court decision is clearly erroneous.

See Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.

As with state court decisions which are "contrary to" established federal law, where a state court

decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

/ / /

/ / /

9

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000). Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

## III. DISCUSSION

Petitioner claims: (1) he was prejudiced when an item not admitted into evidence, specifically an ATM receipt, was found by a member of the jury during deliberations; (2) the prosecutor committed prejudicial misconduct by vouching for a witness and attacking the credibility of defense counsel; (3) the trial court abused its discretion by denying petitioner's motions for substitution of counsel; (4) defense counsel was not notified of a request by the jury for a read-back of witness testimony; (5) ineffective assistance of trial counsel; and (6) ineffective assistance of appellate counsel.

### A.   Discovery of ATM Receipt Not Admitted Into Evidence

This claim was addressed by the California Court of Appeal on direct appeal. The state court began its discussion by outlining the following background:

> At the end of the jury's first day of deliberations, a juror brought to the attention of the court attendant the fact that an ATM sales receipt had been found by the jury in pocket of the coat in which the revolver had been found, which coat was an exhibit in evidence. The juror pointed out the date of the receipt, noting it was the night before the Oak's Lounge robbery. The receipt was not in evidence. Apparently no one knew the receipt was in the pocket of the coat. The receipt turned out to be for a beverage bought at a Kwik Stop Market by Barbara Mitchell (defendant's wife) on October 19, 2004, at 8:51 p.m. The court attendant told the juror who pointed it out that it was probably insignificant, but she would inform the court.

The next morning the trial court expressed to counsel its intention to admonish the jury it was not to consider this item. It was not admitted into evidence and was not admitted before them. It was inadvertently discovered and they were to disregard it. Since the jury had at this point reached verdicts on the Oak's Lounge and Trino's Bar robberies, the trial court said it would inquire of the jury as to whether or not the verdicts were reached before or after they discovered the receipt. If the verdicts were reached after the discovery, the trial court stated it was its current intention to give back the completed verdict forms and direct the jury to renew their deliberations on those counts and reconsider the evidence in light of the admonishment not to consider the receipt. Defendant moved for a mistrial, which the trial court denied in light of how it intended to proceed with the jury.

The state court then outlined a lengthy exchange which took place between the judge and jury, and continued its discussion as follows:

After the jury left the courtroom, the trial court stated again it was satisfied based on this exchange the jury had not considered the receipt or its contents in their deliberations. That was the reason the court did not instruct them to begin their deliberations anew. The trial court denied defendant's renewed motion for a mistrial.

Assuming that petitioner had not forfeited his claim, the state court concluded that there was no prejudicial error:

Defendant does not argue the receipt found by the jury would have been inadmissible evidence if it had been discovered earlier. It was simply inexplicably missed by law enforcement, the prosecution and the defense. Therefore, the receipt was not "outside" evidence the jury should never consider. (citation omitted). The evidence was a document the jury was not entitled to consider because it had not been introduced into evidence at trial. The receipt had been inadvertently given to the jury by the court with the coat exhibit, which counsel stipulated into evidence and was properly admitted into evidence.

In this situation, we follow the California Supreme Court's statement of the applicable standard of prejudice. (citation omitted). "'When , as in this case, a jury innocently considers evidence it was inadvertently given, there is no [jury] misconduct.' [Citation]. Rather, all that appears is ordinary error. . . . [¶] [W]ith ordinary error, prejudice must be shown and reversal is not required unless there is a reasonable probability that an outcome more favorable to the defendant would have resulted. [Citation]." (citations omitted).

Contrary to defendant's claim, the identification evidence relating to the Oak's Lounge robbery was very strong. Admittedly there was some confusion among the witnesses regarding what defendant was seen wearing and some inaccuracies in their description of the robbers, but Tillis and O'Dell were unequivocal in their identification of defendant as the male robber at the physical lineup and at trial. Tillis made a positive

11

identification of defendant at the field show-up, rejecting another suspect he was shown.  Black also identified defendant at the field show-up.  He identified defendant after being driven past another suspect who he said was not the man he saw climb over the fence.  O'Dell, Tillis, Fannin and Black all identified defendant at trial.  Tillis testified he watched defendant get into the driver's door of the Ford Explorer as it left from the Oak's Lounge.  Inferentially, it was defendant he saw get out of the driver's door after the accident, with the money bag, and run up the hill.  Defendant was found with stapled $10 bills in his shoes.  Money, checks made out to the Oak's Lounge, and the coat with the gun were found in the Explorer.  Defendant testified he had never been inside the Oak's Lounge in his life, yet fingerprints were found on the money tray located inside the safe at the Oak's Lounge.  In the face of this evidence, defendant's story was a patently inadequate and implausible explanation.  Moreover, defendant's credibility was seriously undermined.  Defendant admitted he made up stories (lies) to explain his presence in the area above the freeway.  Defendant was impeached with several of his prior convictions.

The evidence was nearly as strong with respect to the robbery of Trino's Bar.  Biagi's identification of defendant at the physical lineup was swift and certain.  She had no doubt in her mind when she identified defendant at trial based on the lump on defendant's head, his eyes and his nose.  Slauson also immediately identified defendant at the physical lineup and was definite about his in-court trial identification of defendant.  LaBella's driver's license, taken from the cash register in the robbery of Trino's Bar, was found in between the driver's seat and the center console of the Explorer when it was searched after defendant's arrest.  Defendant's hitchhiker explanation was far-fetched.

The identification evidence relating to the robbery of Goeman's Lounge was weaker then the other two cases.  However, the jury had not yet reached verdicts relating to Goeman's Lounge when the sales receipt was discovered.  The jury was specifically admonished not to consider the sales receipt in its further deliberations.  The sales receipt did not directly relate to the robbery at Goeman's Lounge, but only to defendant's version of the events following the Oak's Lounge robbery.  The similarities between the robberies, particularly the robbery of Trino's Bar and the robbery of Goeman's Lounge, strongly supported the identification of defendant as the robber made by Valadez and Mooney.

We are convinced there is no reasonable probability that an outcome more favorable to the defendant would have resulted if the sales receipt had not inadvertently been given to the jury.  (citation omitted).

For the same reasons, the state court concluded that any error rising to the level of federal

constitutional magnitude was harmless.

/ / /

/ / /

/ / /

1       Petitioner argues that, while California law considers the inadvertent discovery by

2 the jury of evidence not admitted to be only ordinary error, "[t]he Ninth Circuit Court of Appeals

3 does not draw the same distinction."  Citing <u>Hughes v. Borg</u>, 898 F.2d 695 (9th Cir. 1990),

4 petitioner contends that such errors amount to jury misconduct and are not subject to harmless

5 error analysis.  Petitioner also argues that he was denied his rights to confrontation and assistance

6 of counsel with respect to the ATM receipt.

7       Initially, the court finds that no error of constitutional magnitude occurred.  As the

8 state court observed following a discussion of the exchange that took place between the trial

9 judge and the jury, the ATM receipt was not considered with respect to either of the verdicts

10 which had been reached at the time.  Furthermore, the jury was specifically instructed not to

11 consider the ATM receipt for any purpose.  The court must assume that the jury followed the trial

12 court's instructions and did not consider the receipt in reaching any verdict.

13       Even if error did occur, it was harmless.  Non-structural errors may be considered

14 harmless.  <u>See</u> <u>Hedgpeth v. Pulido</u>, 129 S.Ct. 530, 532 (2008) (per curiam) (citing <u>Chapman v.</u>

15 <u>California</u>, 386 U.S. 18 (1967)).  Constitutional errors fall into one of two categories – trial errors

16 or structural errors.  <u>See</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 629 (1993).  Trial error "occur[s]

17 during the presentation of the case to the jury" and "may . . . be quantitatively assessed in the

18 context of other evidence presented in order to determine" its effect on the trial.  <u>Arizona v.</u>

19 <u>Fulminante</u>, 499 U.S. 279, 307-08 (1991).  Structural errors, on the other end of the spectrum,

20 relate to trial mechanism and infect the entire trial process.  <u>See</u> <u>id.</u> at 309-10.  Denial of the right

21 to counsel is an example of a structural error.  <u>See</u> <u>Brecht</u>, 507 U.S. at 629-30 (citing <u>Gideon v.</u>

22 <u>Wainwright</u>, 372 U.S. 335 (1963)).  Improperly impeaching a defendant based on his silence

23 after receiving <u>Miranda</u> warnings, however, is a trial error.  <u>See</u> <u>Brecht</u>, 507 U.S. 629 (citing

24 <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976)).  Structural errors to which the harmless error analysis does

25 not apply are the "exception and not the rule"  <u>See</u> <u>Rose v. Clark</u>, 478 U.S. 570, 578 (1986).

26 / / /

1          Petitioner would have the court regard any error associated with the ATM receipt

2    as a structural error requiring reversal.  The court does not agree.  The gravamen of plaintiff's

3    claim of error is that the jury committed misconduct by having access to evidence which was not

4    admitted and as to which he had no opportunity of confrontation.  However, not every incident of

5    juror misconduct or bias requires a new trial.  See United States v. Klee, 494 F.2d 394, 396 (9th

6    Cir. 1974).  "The test is whether or not the misconduct has prejudiced the defendant to the extent

7    that he has not received a fair trial."  Id.  On collateral review, if misconduct occurred, a

8    petitioner must show that the alleged error "'had substantial and injurious effect or influence in

9    determining the jury's verdict.'"  Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993) (quoting

10   Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)); see also Hughes v. Borg, 898 F.2d 695, 699

11   (1990).  Given these authorities, it is clear that the error alleged here is subject to harmless error

12   analysis.

13          In Chapman, a case before the Supreme Court on direct review, the Court held

14   that "before a [non-structural] constitutional error can be held harmless, the court must be able to

15   declare a belief that it was harmless beyond a reasonable doubt."  386 U.S. at 24.  A different

16   harmless error standard applies to cases on collateral review.  In Brecht, the Court stated that

17   applying the Chapman standard on collateral review "undermines the States' interest in finality

18   and infringes upon their sovereignty over criminal matters."  507 U.S. at 637.  The Court also

19   noted that the Chapman standard is at odds with the historic meaning of habeas corpus – which is

20   meant to afford relief only to those who have been grievously wronged – because it would

21   require relief where there is only a reasonable possibility that a constitutional error contributed to

22   the verdict.  See id.  Therefore, in habeas cases, the standard applied in Kotteakos v. United

23   States, 328 U.S. 750 (1946), governs harmless error analysis for non-structural constitutional

24   errors.  See Brecht, 507 U.S. at 637.  Under this standard, relief is available where non-structural

25   error occurs only where such error "had a substantial and injurious effect or influence in

26   determining the jury's verdict."  Kotteakos, 328 U.S. at 776.

                                                  14

1        Because this case is presented as a collateral challenge (as opposed to a direct

2    appeal), the appropriate harmless error test asks whether the error had a substantial and injurious

3    effect on the verdict.  For the reasons outlined by the state court, this court finds any error to be

4    harmless under this standard.  Specifically, the identification evidence against petitioner was

5    overwhelming and would have resulted in his conviction regardless of any weight the jury might

6    have given to the ATM receipt.  All the witnesses identified defendant in lineups and in open

7    court at the time of trial.  The modus operandi of the crimes was the same.  LaBella's driver's

8    license linked defendant to the crimes, as did the stapled $10 bills found in petitioner's

9    possession.

10       Based on the foregoing, the court cannot say that the state court's determination of

11   this claim was based on an unreasonable application of clearly established federal law, contrary

12   to clearly established federal law, or based on an unreasonable determination of the facts.

13       **B.    <u>Prosecutorial Misconduct</u>**

14       Success on a claim of prosecutorial misconduct requires a showing that the

15   conduct so infected the trial with unfairness as to make the resulting conviction a denial of due

16   process.  <u>See</u> <u>Greer v. Miller</u>, 483 U.S. 756, 765 (1987).  The conduct must be examined to

17   determine "whether, considered in the context of the entire trial, that conduct appears likely to

18   have affected the jury's discharge of its duty to judge the evidence fairly."  <u>United States v.</u>

19   <u>Simtob</u>, 901 F.2d 799, 806 (9th Cir. 1990).   Even if an error of constitutional magnitude is

20   determined, such error is considered harmless if the court, after reviewing the entire trial record,

21   concludes that the alleged error did not have a "substantial and injurious effect or influence in

22   determining the jury's verdict."  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993).  Error is

23   deemed harmless unless it "is of such a character that its natural effect is to prejudice a litigant's

24   substantial rights."  <u>Kotteakos v. United States</u>, 328 U.S. 750, 760-761 (1946).  Depending on

25   the case, a prompt and effective admonishment of counsel or curative instruction from the trial

26   judge may effectively "neutralize the damage" from the prosecutor's error.  <u>United States v.</u>

1  Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1993) (citing Simtob, 901 F.2d at 806).

2          As to petitioner's claims of prosecutorial misconduct, the Court of Appeal

3  outlined the following background as to prosecutory misconduct claims raised on direct appeal:

4          Penny Hummell, an identification technician for the Sacramento
   Sheriff's Department, testified to her comparison of defendant's known
5  fingerprints with the latent prints found on various items recovered from
   Goeman's Lounge, Trino's Bar, and Oak's Lounge after the robberies.
6  Defendant's prints did not match any of the latent prints found at
   Goeman's Lounge or Trino's Bar, but Hummell testified defendant's
7  prints matched in excess of eight points of comparison to the prints on the
   money tray of the safe at Oak's Lounge.  She was absolutely certain about
8  the match.  On cross-examination, however, Hummell could not say
   exactly how many points of comparison there were between the prints
9  without reviewing the prints before testifying.  No one had asked her to
   review the prints before testifying.  Her report only reflected a positive or
10 negative finding.  She could not answer a number of specific questions
   about whether there was double impressions, debris and smudges on the
11 latents without reexamining the prints at her office.  She repeatedly stated
   she would have to examine the prints again to answer questions by
12 counsel.
           In his closing argument, defense counsel argued Hummell's
13 testimony "was the most abysmal display of forensic evidence."  He
   argued Hummell could have used the magnifying glass she had with her on
14 the stand to examine the prints or used her lunch hour to examine the
   prints so as to be prepared to answer questions.  Defense counsel argues it
15 was a "disgrace" the way the sheriff's department claimed a match in this
   case.  He went on to add, "Maybe it's important for Miss Hummell and
16 other people in the latent bureau over at the sheriff's department to do
   their job and look at things and make their call, maybe that's important.
17 And maybe nothing else is important to them. . . ."  But the jury was
   entitled to demand, "that somebody get off their butt and show you."  "It
18 was horrible and this was a court of law."  Defendant urged the jury not to
   give Hummell's testimony any credibility.
19         The prosecutor began her rebuttal argument with the following
   comments: "According to the defense, every witness testified [sic] for the
20 prosecution is mistaken.  His client just has a bad streak of bad luck it
   seems. [¶] Defense even came down on Penny Hummell from the
21 Sacramento Sheriff's Department on the fingerprints.  This is nothing new,
   this is what we expect of a defense attorney in a criminal case."  Defense
22 counsel's objection based on mischaracterization was overruled.
           The prosecution continued: "In fact, if we were to take a class
23 called fingerprint defense 101, first lesson you would learn is that if the
   DA doesn't have your prints in evidence, claim this proves your client's
24 innocence.  Obviously if you were there and touched the stuff, they would
   have found the prints."  Defense counsel interrupted, stating he understood
25 the point the prosecutor was trying to make, "but I don't think it's fair to
   attribute my state of mind or my approach to this in this manner."  The
26 court responded: "Well, it is argument.  The jury has been previously

16

1    instructed that argument is not evidence. [¶] But I would caution [the
     prosecutor] to concentrate on what evidence that's shown rather than what
2    tactics may have been used."
            The prosecutor returned to her argument, stating: "And if the DA
3    does have your prints, the defense attorney should go to deny everything or
     claim error or bias, which has been done in this defense's closing
4    argument. [¶] Now, did Miss Hummell seem fingerprint happy in this case
     at all?  She compared multiple items of evidence.  Should she have looked
5    to see how many points of comparison there were on the latent before she
     came to Court?  Absolutely.  Unprofessional all the way.  But to discredit
6    her testimony and make it sound like she was willing to come in here, risk
     her reputation, risk her career and say that she found a matching latent
7    fingerprint to this defendant, someone she doesn't know, is just a bogus
     argument.  It does not work here. [¶] The defense attorney in this case. . .
8    is very capable, very competent, very respectable person.  His job here is
     to focus on the details that came out during the trial. [¶] It's not to bring
9    your attention to all the evidence that points to his client's guilt, the
     overwhelming evidence that points to his client's guilt.  It's to make you
10   focus and confuse you and to focus on snippets of evidence in this case."
     Defense counsel objected again to the characterization of his intent.  The
11   court suggested the prosecutor focus on what the evidence had shown.

12   The Sacramento County Superior Court outlined the following background regarding a

13   prosecutorial misconduct claim presented on collateral review:

14          Petitioner alleges that the prosecutor committed misconduct by
     instructing witness David Mooney not to talk to his investigator.  At trial,
15   Mooney testified regarding the Goeman's Lounge robbery, one of the three
     robberies for which this Petitioner was prosecuted.  Mooney did not attend
16   a physical lineup.  He was shown photographs of the men from the lineup
     in February 2005.  He testified that he told the officer that he thought the
17   person who robbed Goeman's Lounge might be either photograph #3 or
     photograph #4 (Petitioner).  At trial, Mooney identified Petitioner in court
18   as the robber.  The officer testified that Mooney actually eliminated both
     photographs #3 and #4.  Mooney was cross-examined regarding his
19   identification.
            Attached to his petition is a note to Petitioner's trial counsel from
20   the defense investigator summarizing a conversation with Mooney.  The
     investigator stated that he called Mooney and told him he would like to
21   show him a photo lineup.  The investigator states that Mooney told him he
     called the District Attorney's office and was told by a secretary that he
22   should not talk to the investigator without someone from their office
     present.  The investigator told Mooney that the District Attorney could not
23   tell him who he could or could not talk to.  Mooney told the investigator
     that he did not feel comfortable talking to him until he spoke with the
24   District Attorney.

25   The state courts then addressed the three specific claims of prosecutorial misconduct.

26   / / /

                                        17

1.     Vouching

Regarding vouching, the state court held:

> With respect to defendant's claim the prosecutor's argument disputing that Hummell would be "willing to come in here, risk her reputation, risk her career," constituted impermissible vouching, defendant failed to object to the comment and request an admonition.  Defendant's other objections to the mischaracterization of his counsel's intent did not fairly encompass this comment by the prosecutor.  Defendant has failed to preserve the issue for review.  (citation omitted).
> In any event, we see no misconduct.  There is no improper "vouching" for a witness unless the prosecutor suggests personal knowledge of matters outside the record.  (citation omitted).  The prosecutor's remarks here did not suggest any such thing.  (footnote omitted).  The comment criticized the defense argument and was simply a response to the suggestion the only thing important to Hummell and the sheriff's department was to make their "call" on latent prints, not to adequately support their conclusion for the jury.

In bolstering a witness's credibility, a prosecutor may not overstep the bounds of propriety and fairness.  Vouching is improper when the prosecutor places "the prestige of the government behind the witness" by providing "personal assurances of [the] witness's veracity."  United States v. Kerr, 981 F.2d 1050, 1053 (9th Cir. 1992) (citing United States  v. Roberts, 618 F.2d 530, 533 (9th Cir. 1980)).  "A prosecutor has no business telling the jury his individual impressions of the evidence."  Id.   There is no bright-line rule about when improper vouching has occurred.   A number of factors must be weighed including: (1) the form of vouching; (2) how much the vouching implies that the prosecutor has knowledge outside the record of the witness's truthfulness; (3) any inference that the court is monitoring the witness's veracity; (4) the degree of personal opinion asserted; (5) the timing of the vouching;  the extent to which the witness's credibility was attacked; (6) the specificity and timing of a curative instruction; and (7) the importance of the witness's testimony and the vouching to the case overall.  See United States v. Jackson, 84 F.3d 1154, 1158, 1278 (9th Cir. 1996).  When reviewing for plain error, the court must then balance the seriousness of the vouching against the strength of the curative instruction and closeness of the case.  Statements bearing on credibility that are plainly advanced as argument do not constitute vouching.  See id.

1    The court agrees with the state court that no vouching occurred.  The prosecutor

2    was merely countering the defense argument concerning Hummell.  The prosecutor in no way

3    implied knowledge of facts outside the record.  Here, the prosecutor's rebuttal argument was

4    essentially an argument as to Hummell's credibility (i.e., Hummell should be believed despite the

5    defense argument to the contrary).  Such statements do not constitute vouching and are

6    permissible argument.  The state court's denial of this claim was neither contrary to nor an

7    unreasonable application of federal law.

8              2.    Attacking Credibility of Defense Counsel

9              As to petitioner's claims that the prosecutor committed prejudicial misconduct by

10   attacking the credibility of his trial counsel, the state court held:

11              A prosecutor commits misconduct by accusing defense counsel of
             fabricating a defense, suggesting defense counsel is free to deceive a jury,
12             or otherwise attacking the integrity of defense counsel. (citations omitted).
             However, a prosecutor "has wide latitude in describing the deficiencies in
13             opposing counsel's tactics and factual account." (citations omitted).  "An
             argument which does no more than point out that the defense is attempting
14             to confuse the issues and urges the jury to focus on what the prosecution
             believes is the relevant evidence is not improper. [Citation]." (citation
15             omitted).  The prosecution may "vigorously attack the defense case and
             argument if that attack is based on the evidence." (citation omitted).
16              The prosecutor's argument here was principally a response to the
             defense attack on Hummell's testimony.  It generally fell within the wide
17             latitude allowed a prosecutor to point out the deficiencies in the tactics and
             argument of the defense.  The prosecutor's argument that the defense was
18             trying to get the jury to focus on details instead of the overwhelming
             evidence of defendant's guilt was not inappropriate argument.  To the
19             extent that some of the prosecutor's comments went outside the evidence
             to possibly question the integrity of defense counsel, the trial court
20             cautioned the prosecutor to concentrate and focus on the evidence, not
             defense tactics, and essentially admonished the jury it had been previously
21             instructed that argument is not evidence.   The jury was also instructed to
             decide all questions of fact from the evidence received in the trial.
22             (citation omitted).  We presume the jury heeded the court's admonition
             and followed its instructions.  (citations omitted).  Thus, the admonition
23             and instruction cured any harm and defendant was accorded the fair trial to
             which he was entitled.  (footnote omitted).

24

25   As discussed above, the court agrees with the state court that the prosecutor's comments during

26   closing argument were in essence a response to the defense attack on Hummell.  Such comments

are generally proper argument and do not constitute misconduct.   The court also agrees with the

state court that, to the extent the prosecutor's comments improperly attacked defense counsel's

integrity, the trial court promptly admonished the jury and gave the additional instruction that the

verdict had to be based on the evidence and not on the attorneys' arguments.  Again, this court

cannot say that the state court's denial was either contrary to or an unreasonable application of

federal law.

                3.      Access to Witness Mooney

The state court discussed this claim as follows:

> Petitioner claims that if his investigator would have been able to interview Mooney and if Mooney told the investigator the same thing he told the officer, the jury would have been less likely to believe Mooney's testimony in which he identified Petitioner as the Goeman's Lounge Robber.  He claims that since the bartender could not absolutely identify Petitioner as the robber, it was likely that Petitioner would not have been convicted of the Goeman's Lounge robbery.
> However, Petitioner's claim is based on multiple layers of hearsay. Specifically, the investigator's report about what Mooney told him the District Attorney's secretary told him is double hearsay and not a valid basis for granting habeas relief.  (citation omitted).  Thus, this claim must be denied.
> In addition, it is entirely speculative as to whether the petitioner was prejudiced by the inability to show another line up to the identifying eyewitness.  If in a second line up the eyewitness again failed to identify the defendant this would not greatly assist the defense.  If in the second line up, the eyewitness corrected the officer's apparent misimpression, the defense would be weakened.

Here, the court agrees with respondent that any misconduct, if it occurred at all, could not have

rendered the outcome of the trial unfair because the fact remains that Mooney positively

identified defendant at the time of trial.

**C.**     **Trial Court's Denial of Motion to Substitute Counsel**

The state court outlined the following background:

> Prior to the start of defendant's preliminary hearing, defendant made a motion for substitution of counsel pursuant to *People v. Marsden, supra,* 2 Cal.3d 118 (*Marsden*).  The trial court held an in camera hearing at which defendant complained about his counsel's failure to file certain motions and to obtain particular discovery.  Defense counsel responded

with his reasons for wanting to delay filing the motions and explained he was undertaking discovery, investigation and research for defendant's case.  Defense counsel represented he had discussed all legal issues with defendant at length and acted on all of them.  The trial court found defense counsel's actions were not only competent, but showed pretty good tactical sense.  Defendant's motion was denied.

On the first day of trial, defendant made a second *Marsden* motion.  At the in camera hearing, he claimed there was no client relationship at all between himself and defense counsel.  According to defendant, defense counsel rejected all of his input, believed defendant to be guilty, and was making only a passive effort to represent defendant.  Defense counsel failed to file certain motions defendant thought important, failed to investigate and subpoena witnesses, failed to make objections at the preliminary hearing, improperly waived time, and was improperly investigating defendant's daughter.  Defendant and counsel had argued at every interview.  Defendant stated one such argument became so intense it resulted in racial and improper name calling by both defendant and counsel.  Defendant said he could not be comfortable with being represented by an attorney when they were calling each other names.  He felt it would be a miscarriage of justice to allow counsel to continue to represent him.

Defense counsel expressed the opinion that there was a client relationship between defendant and himself, although defendant took offense whenever counsel questioned or analyzed defendant's theories.  Counsel listened to defendant and took notes.  Defense counsel said defendant became angry at one meeting and called counsel a "honkey," but denied he ever referred to defendant in a racial way.  As counsel left that meeting, defendant was standing up yelling at him, but counsel said only, "Have a nice day."  Counsel explained his reasons for the timing of the filing of defense motions and his decision to forego filing other motions.  Counsel claimed he had given defendant every scrap of discovery and research and had never expressed the belief defendant was guilty.  He had followed up on all lines of investigation suggested by defendant.  Counsel explained his reason for failing to make objections at the preliminary hearing.  Defense counsel contended there was good cause for seeking the continuance.  Defense counsel explained his actions with respect to defendant's daughter.

Defendant responded that he believed a police officer's report was a lie, that defense counsel had refused to pursue that line of inquiry, had refused to request certain discovery and had refused to file a motion to dismiss.  As to the incident of name calling, defendant claimed he asked counsel if the reason his last client had killed himself was because counsel was not listening.  Counsel became very angry and called defendant an asshole bastard for saying that.

Defense counsel claimed there was no basis for the motion defendant wanted and that he had not refused to request discovery.  Counsel admitted he had told defendant he was an asshole for saying it was no wonder counsel's last client had killed himself, but claimed it was early in their conversation and they continued their conversation after that.  Counsel claimed he did not have any problem communicating with defendant if he addressed the points of the case and did not make personal

21

remarks.  He did not leave defendant until it was clear defendant did not want to continue to communicate.

The trial court denied defendant's second *Marsden* motion, finding defense counsel had done a thorough investigation and provided excellent representation.  The court found counsel and defendant had been communicating.  There was no problem with defendant being able to effectively relate his concerns and counsel had not ignored them.  While counsel did not always agree with defendant, he had always investigated.  The trial court found continued representation of defendant by defense counsel would not interfere with defendant's defense.  Defendant disagreed with the court's ruling, arguing that after their huge argument, counsel would not represent defendant to the best of his ability.  He could not be unbiased.  Defendant had taken all the initiative and counsel had only provided passive representation.  The trial court stated it accepted defendant's representation of what happened and understood the level of heat that was in their argument, but still concluded they were communicating and there was not enough to say defendant was not getting adequate representation.

Defendant made a third *Marsden* motion after he finished testifying at trial and defense counsel indicated he was not going to call any more witnesses.  Defendant complained defense counsel had not asked a number of questions of Biagi and Tillis, should have objected to a photograph showing defendant in handcuffs, and should have subpoenaed witnesses who gave different descriptions of the robber running from the accident.  Counsel said he asked many of the questions requested by defendant during trial and explained why he had not asked others.  Defense counsel said he used the photo showing defendant after he was arrested as evidence supporting defendant's description of what he was wearing.  Defense counsel explained he did not call the witnesses defendant wanted because, based on interviews with them, he felt they would have added nothing helpful and would have risked emphasizing that only two people were seen running from the car.  The court found defense counsel's tactical decisions were reasonably justified and denied defendant's third motion.

Defendant made a fourth *Marsden* motion after the jury's return of verdicts.  Defendant contended the prosecutor and defense counsel had committed a crime in concealing modified and planted fingerprint evidence.  Defendant complained defense counsel had failed to question Mooney regarding one matter and again stated counsel had only passively represented him throughout trial.  Defense counsel acknowledged he had neglected to bring up the one matter with Mooney, but indicated defendant was wrong in his understanding of what had occurred with the fingerprint evidence.  Defense counsel had actually refrained from bringing out evidence of an additional match between defendant's fingerprints and one of the latent prints found on the money tray in the safe at the Oak's Lounge.  The trial court found defense counsel's representation was better than adequate, that the evidence did not establish any collusion between defense counsel and the prosecutor, and that for purposes of the remainder of the trial on defendant's prior convictions, defendant and defense counsel had not become embroiled in such an irreconcilable conflict that it would result in ineffective representation.  Defendant's motion was

denied.

On the day set for sentencing, defendant stated he wanted to make a record on his *Marsden* issues. He then submitted to the court a written motion outlining his complaints. Defendant claimed there was new evidence showing errors with respect to the latent prints found on the money tray, that defense counsel withheld the evidence because of the argument with defendant, that the ATM receipt found in the coat was planted evidence, that it was jury misconduct for the jurors to search the pockets of the coat, that defense counsel did not interview witnesses until after the trial began and failed to interview and subpoena other witnesses, that counsel should have brought a motion to dismiss based on denial of defendant's speedy trial rights, that defense counsel knew the additional time obtained allowed the prosecution to strengthen its case, that defense counsel prejudiced the jury by showing the photograph of defendant in handcuffs, that counsel denied him the right to participate in his defense, that defense counsel failed to use a newspaper clipping containing a story about a victim's misidentification in another case, and that defendant's work records should have been introduced as an exhibit. Defendant concluded defense counsel's "overall representation was a farce and a sham."

The trial court stated each of these issues had been raised and dealt with earlier. The court declined to change its previous rulings. The court said: "I think the record adequately reflects the issues that were raised and what my rulings were and they stand."

The state court then analyzed the claim as follows:

Defendant claims it is clear from the record there was an irreconcilable conflict between defendant and his appointed counsel such that the trial court abused its discretion in failing to substitute counsel in response to defendant's *Marsden* motions. We disagree.

* * *

In this case it appears the conflict between defendant and defense counsel arose primarily because defendant wanted his counsel to do everything defendant suggested and wanted. Defendant became very angry and argumentative over the tactical decisions his counsel made. When counsel continued to use his own judgment in conducting the defense, defendant's anger seems to have grown into a general mistrust of and lack of confidence in defense counsel. However, counsel was entitled to make such decisions and the record reflects a reasonable basis for counsel's actions. The trial court was entitled to accept counsel's representation that he still discussed all legal issues with defendant at length and acted on all of them, that he listened to defendant and took notes, that he followed up on all lines of investigation suggested by defendant, and that he continued to communicate with defendant even after their arguments and name-calling. (citation omitted). Thus, there was not a breakdown of communication between defendant and defense counsel. (citations omitted). Any lack of confidence in counsel felt by

23

defendant did not have a legitimate basis (citation omitted), but was based
on defendant's intransigence in wanting counsel to accede to all of his
wishes and demands.  This does not require substitution of counsel.
(citations omitted).

      The trial court did not abuse its discretion in denying defendant's
*Marsden* motions. (footnote omitted).

"A State has a duty to provide an indigent defendant with effective assistance of counsel through his first appeal."  Hendricks v. Zenon, 993 F.2d 664, 669 (9th Cir. 1993) (citing Douglas v. California, 372 U.S. 353, 358 (1963)).   In California, a criminal defendant who is dissatisfied with court-appointed counsel must be permitted to state the reasons why the defendant believes the attorney should be replaced.  See People v. Marsden, 2 Cal.3d 118, 123-24 (1970).  When a defendant seeks to discharge counsel and substitute another attorney on the ground of inadequate representation, the court is required to allow the defendant to explain the basis for the motion and relate specific instances of the attorney's deficient performance.  See id. Substitution is appropriate where the defendant can show a breakdown in the attorney-client relationship or "an actual conflict of interest. . . ."  Wood v. Georgia, 450 U.S. 261, 273-74 (1981).  Mere disagreement or friction between client and counsel is insufficient ground for substitution.  See Morris v. Slappy, 461 U.S. 1, 13-14 (1983).  Denial of a Marsden motion can only amount to a constitutional violation where there was a conflict between the defendant and counsel which prevented effective representation.  See Schell v. Witek, 218 F.3d 1017, 1026 (9th cir. 2000) (en banc).

      Here, the record does not demonstrate a complete breakdown or actual conflict of interest.  Rather, as the state court observed, petitioner's Marsden motion was based largely on counsel's refusal to present every line of argument suggested by petitioner.  There is no evidence that counsel did not investigate the lines of defense suggested by petitioner.  It is, of course, left to counsel's judgment as to which lines of defense to actually pursue and present to the jury.[3]

---

[3]     Petitioner's claim of ineffective assistance of counsel are discussed below.

D.  **Jury Request for Read-Back**

Petitioner claims that the trial court erred because it did not provide the jury a requested readback of testimony and because it failed to notify counsel of the requested readback. Addressing this claim in the context of petitioner's post-conviction actions, the state court held:

> Petitioner's claims fail because his own allegations indicate the requested readback was provided and counsel were notified. Specifically, the petition at page eight states: "The court's transcript indicates that counsel was notified and that the court reporter went into the deliberation room to readback the requested testimony. (CT 0248-0249)."
> The basis of petitioner's claim appears to be that the reporter's transcript does not reflect that the readback was given or counsel were notified. However, this alone is insufficient to establish a prima facie claim that the readback was not given or that counsel were not notified of the request.

Petitioner's claim is without merit because, as petitioner himself concedes with citation to the transcript, the readback was indeed provided and counsel was notified. On this record, the court cannot say that the state court's denial was either contrary to or an unreasonable application of federal law.

E.  **Ineffective Assistance of Counsel**

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. See id. at 688. To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. See id. at 690. The federal court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. See id. In making this determination, however, there is a strong presumption "that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

1    Strickland, 466 U.S. at 689).

2         Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S.

3    at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

4    unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

5    reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.;

6    see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

7    determine whether counsel's performance was deficient before examining the prejudice suffered

8    by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an

9    ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

10   followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

11   697).

12        The Strickland standards also apply to appellate counsel. See Smith v. Robbins,

13   528 U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882

14   F.2d 1428, 1433 (9th Cir. 1989).  However, an indigent defendant "does not have a constitutional

15   right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel,

16   as a matter of professional judgment, decides not to present those points."  Jones v. Barnes, 463

17   U.S. 745, 751 (1983).  Counsel "must be allowed to decide what issues are to be pressed."  Id.

18   Otherwise, the ability of counsel to present the client's case in accord with counsel's professional

19   evaluation would be "seriously undermined."  Id.; see also Smith v. Stewart, 140 F.3d 1263, 1274

20   n.4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary,

21   and is not even particularly good appellate advocacy.")  Further, there is, of course, no obligation

22   to raise meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88.  Thus,

23   counsel is not deficient for failing to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to

24   demonstrate prejudice in this context, petitioner must demonstrate that, but for counsel's errors,

25   he probably would have prevailed on appeal.  See id. at n.9.

26   / / /

1.    <u>Trial Counsel</u>

Petitioner claims that trial counsel was ineffective for failing to offer petitioner's work records into evidence.  According to petitioner, these record establish that he was working at the time of the Goeman's Lounge robbery.  This claim was addressed by the Sacramento County Superior Court on collateral review as follows:

> In his second claim, Petitioner alleges that his trial counsel withheld exculpatory evidence that should have been placed before the jury. Specifically, he alleges that his trial counsel failed to offer his work records as evidence.  He claims these records were exculpatory because the prosecutor argued that he missed work during the time when the robberies took place and would have shown that he was working the day the Goeman's Lounge was robbed.  In essence, Petitioner is claiming that his trial counsel was ineffective for failing to offer these records as evidence at trial.
>
> * * *
>
> In the instant case, Petitioner's allegations fail to establish an ineffective assistance of counsel claim.  Petitioner acknowledges that the work records do not show the time of arrival or departure, but argues that these times could be established through the alarm system of the place where he worked.  As seen from the evidence presented at trial, the Goeman's Lounge was robbed at approximately 11 p.m. on October 10, 2004.  Petitioner does not allege that his work record would have shown that he was working at 11 p.m. on October 10, 2004.  His allegations fail to show that the work records were exculpatory.  Therefore, his allegations fail to establish that his counsel was deficient for failing to offer the records and that he suffered prejudice as a result of the records not being introduced at trial.  As a result, Petitioner has failed to state a prima facie claim for relief based on his allegation that his trial counsel failed to offer exculpatory evidence.

As petitioner acknowledges, his work records do not establish the times he worked the evening of the Goeman's Lounge robbery.  Thus, counsel did not render deficient performance for choosing not to introduce such evidence.  Moreover, because the work records would not have established any alibi, petitioner was not prejudiced by counsel's failure to introduce the evidence.  For both these reasons, the court cannot say that the state court's denial was either contrary to or an unreasonable application of the <u>Strickland</u> standard.

/ / /

2.   Appellate Counsel

Petitioner claims that his appellate counsel was ineffective for failing to raise arguments on appeal concerning the jury's request for a readback.  This claim was raised and denied by the state court on collateral review.  As discussed above, the court finds that there was no error with respect to the readback.  The record demonstrates, and petitioner concedes, that the requested readback was provided and that counsel was notified of the jury's request.  Appellate counsel was not ineffective for omitting a frivolous claim on appeal.  Therefore, this court cannot state that the state court's decision was either contrary to or based on an unreasonable application of Strickland.

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that petitioner's petition for a writ of habeas corpus (Doc. 1) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  November 18, 2010

_Craig M. Kellison_
CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE

28